**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**DAVID VERNELL HOWELL,**

     **Plaintiff,**

**vs.**                           **Case No.  4:12-CV-197-SPM/CAS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

     **Defendant.**

_____/


**REPORT AND RECOMMENDATION**

This is a Social Security case referred to the undersigned United States

Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review

of the final determination of the Commissioner of the Social Security Administration

(SSA) denying Plaintiff's application for Disability Insurance Benefits (DIB).  After careful

consideration of the entire Record, it is recommended that the decision of the

Commissioner be reversed and remanded for further proceedings.

**I.  Procedural History of the Case**

On June 19, 2007, Plaintiff, David Vernell Howell, filed an application for a period

of disability and DIB, alleging disability beginning on April 7, 1996.  R. 10, 139-43.

(Citations to the SSA Record shall be by the symbol "R." followed by a page number

that appears in the lower right corner.)  Plaintiff states that he filed an application for

Supplemental Security Income Benefits on May 30, 2007, that was denied because of Plaintiff's income level. The denial is not before the Court. Doc. 9 at 2 n.1; R. 70-77.

Plaintiff's date last insured or the date by which his disability must have commenced in order to receive benefits under Title II (DIB) is June 30, 2004. *Id.* at 10.

Plaintiff's application was denied initially on October 24, 2007, and upon reconsideration on May 28, 2008. *Id.* at 10, 82-84, 89-90. On July 1, 2008, Plaintiff filed a request for hearing. *Id.* at 10, 91-92. On March 29, 2010, Plaintiff appeared and testified at a hearing conducted by Administrative Law Judge (ALJ) Philemina M. Jones in Orlando, Florida. *Id.* at 10, 25-67. Howard S. Feldman, an impartial vocational expert, testified during the hearing by telephone. *Id.* at 10, 27, 54-66. Plaintiff was represented by George J. Adler, an attorney. *Id.* at 10, 27, 85-86.

On April 15, 2010, the ALJ issued a Decision denying Plaintiff's application for benefits. *Id.* at 10-20. Plaintiff filed a request for review and on or about June 8, 2010, submitted a memorandum and additional evidence. *Id.* at 4-6, 262-73 (Exhibit 22E). On February 17, 2012, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. *Id.* at 1-5.

On April 18, 2012, Plaintiff filed a complaint with the United States District Court seeking review of the ALJ's decision. Doc. 1. The parties filed memoranda of law, docs. 9 and 12, which have been considered.

## II. Findings of the ALJ

In the written Decision, the ALJ made several findings relative to the issues raised in this appeal:

1. Plaintiff "last met the insured status requirements of the Social Security Act on June 30, 2004." R. 12.

2. Plaintiff "did not engage in substantial gainful activity during the period from his alleged onset date of April 7, 1996 through his date last insured of June 30, 2004." *Id.*

3. "Through the date last insured, [Plaintiff] had the following severe impairments: (1) Back surgery, post laminectomy, back pain, (2) Anxiety, and (3) Depression." *Id.*

4. "Through the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." *Id.*

5. "[T]hrough the date last insured, [Plaintiff] had the residual functional capacity [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) except that [Plaintiff] can only occasionally bend, squat, and climb stairs. [Plaintiff] needs to be able to alternate between sitting and standing. [Plaintiff] can perform simple, routine, repetitive tasks." *Id.* at 14.

6. "Through the date last insured, [Plaintiff] was unable to perform any past relevant work." *Id.* at 18.

7. Plaintiff "was born on July 9, 1958 and was 45 years old, which is defined as a younger individual age 18-44, on the date last insured." *Id.*

8. Plaintiff "has limited schooling, having completed the 9th grade, and is able to communicate in English." *Id.*

9. "Through the date last insured, considering the [Plaintiff's] age, education, work experience, and [RFC], there were jobs that existed in significant numbers in the national economy that [Plaintiff] could have performed" such as "bench work assembly" and "toll/ticket taker," both sedentary/unskilled jobs with a SVP of 2. *Id.* at 19.

10. Plaintiff was not under a disability at any time from April 7, 1996, the alleged onset date, through June 30, 2004, the date last insured. *Id.* at 20.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant

evidence as a reasonable person would accept as adequate to support a conclusion."

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual

findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284

F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[1]

"In making an initial determination of disability, the examiner must consider four

factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining

physicians; (3) subjective evidence of pain and disability as testified to by the claimant

and corroborated by [other observers, including family members], and (4) the claimant's

age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

---

[1] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).

Both the "impairment" and the "inability" must be expected to last not less than 12

months. Barnhart v. Walton, 535 U.S. 212 (2002). In addition, an individual is entitled

to DIB if he is under a disability prior to the expiration of his insured status. *See*

42 U.S.C. § 423(a)(1)(A) and (d); Torres v. Sec'y of Health & Human Servs., 845 F.2d

1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818

F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)(4)(i)-

(v):

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal
those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have any impairments which prevent past relevant
work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits. A positive finding at step three results in approval of the

application for benefits. At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work. Consideration

is given to the assessment of the claimant's RFC and the claimant's past relevant work.

If the claimant can still do past relevant work, there will be a finding that the claimant is

not disabled. If the claimant carries this burden, however, the burden shifts to the

Commissioner at step five to establish that despite the claimant's impairments, the

claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience. Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips, 357 F.3d at 1241. "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory. Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991). Stated somewhat

differently, the ALJ may discount the treating physician's opinion if good cause exists to do so. Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence." Lewis, 125 F.3d at 1440; Edwards, 937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).

The opinion of a non-examining physician is entitled to little weight, and, if contrary to the opinion of a treating physician, is not good cause for disregarding the opinion of the treating physician, whose opinion generally carries greater weight. *See* 20 C.F.R. § 404.1527(d)(1); Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985). A brief and conclusory statement that is not supported by medical evidence, even if made by a treating physician, is not persuasive evidence of disability. Johns v. Bowen, 821 F. 2d 551, 555 (11th Cir. 1987).

The credibility of the claimant's testimony must also be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain. Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988). After considering a claimant's complaints of pain, an ALJ may reject them as not credible. *See* Marbury, 957 F.2d at 839 (citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984)). If an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility.

*See* <u>Wilson,</u> 284 F.3d at 1225. Failure to articulate the reasons for discrediting

subjective testimony requires as a matter of law, that the testimony be accepted as true.

*Id.*

Pain is subjectively experienced by the claimant, but that does not mean that

only a mental health professional may express an opinion as to the effects of pain.

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test
> showing: (1) evidence of an underlying medical condition; and (2) either
> (a) objective medical evidence confirming the severity of the alleged pain;
> or (b) that the objectively determined medical condition can reasonably be
> expected to give rise to the claimed pain.

<u>Wilson</u>, 284 F.3d at 1225. *See* 20 C.F.R §§ 404.1529 (explaining how symptoms and

pain are evaluated); 404.1545(e) (regarding RFC, total limiting effects).

## IV. Medical Evidence that Pre- and Post-Dates April 7, 1996 (Alleged Onset Date)

On August 19, 1991, Mr. Howell was involved in a workplace accident in a

stockroom in which boxes of detergent fell on top of him. R. 324, 371. Mr. Howell saw

an orthopedic surgeon, Norton Baker, M.D., for six months. *Id.* at 371. A magnetic

resonance imaging (MRI) scan revealed a herniated disc at L4-5 and spondylolisthesis.

*Id.*

On September 7, 1993, Mr. Howell began seeing Stephen R. Goll, M.D., for

evaluation of his back and right leg pain. *Id.* at 324. (References to Workers'

Compensation and Kmart, Mr. Howell's employer at the time of his accident, appear on

Dr. Goll's patient notes. *Id.*)

On October 28, 1993, Dr. Goll performed a Gill laminectomy at L4, bilateral

lateral fusion at L4 to L5 with TSRH pedicle screw instrumentation and iliac bone graft.

*Id.* at 320. He was discharged on November 1, 1993. *Id.* Mr. Howell reported significant improvement in his pain following surgery. *Id.* at 315-19.

On May 27, 1994, Dr. Goll released Mr. Howell to return to regular work duty with no restrictions. *Id.* at 317. He opined Mr. Howell had reached maximum medical improvement (MMI) and assigned a 9% partial permanent impairment rating per the Florida Impairment Guide. *Id.*

On August 10, 1994, Mr. Howell returned to see Dr. Goll after being involved in a motor vehicle accident and experiencing significant back pain. Mr. Howell woke up the next day and had "significant back discomfort." He denied "any radiation of his pain down his legs but [complained] of some pain into his left buttock and left hip." *Id.* at 316. After physical examination, the impression was lumbosacral strain status post L4-5 fusion. *Id.* at 315. He was continued at full duty work status. *Id.* at 314.

On May 16, 1995, Mr. Howell returned to Dr. Goll and reported doing fine until three weeks prior when he started having some lower back discomfort. *Id.* at 314. Physical examination showed some mild tenderness over the lumbar spine. He had full range of motion of the lumbar spine, but pain with extension. *Id.* A neurologic exam of the lower extremities showed negative sitting root test bilaterally with no motor, sensory or reflex deficit. *Id.* Dr. Goll noted that Mr. Howell "may continue working without restriction" and that he would return in six weeks for a follow-up visit. *Id.* at 313.[2] On June 20, 1995, Mr. Howell did not keep the appointment. *Id.* at 312.

On April 16, 1996, Mr. Howell returned to see Dr. Goll and reported doing well until December 1995, when he began to have a recurrence of back and left leg

---

[2] Dr. Goll emphasizes various portions of his patient notes. The emphasis is deleted throughout this Report and Recommendation unless otherwise noted.

discomfort.  X-rays of the lumbar spine were taken and showed no evidence of any junctional instability.  *Id.* at 312.  Dr. Goll recommended physical therapy and provided Mr. Howell with an elastic lumbar corset.  *Id.*  Dr. Goll noted that Mr. Howell should remain off work at present and further noted that he has to drive an hour and half to get to work each day.  *Id.* at 311.  The latter note was further explained on May 3, 1996, such that Dr. Goll stated that objective findings of April 16, 1996, support Mr. Howell's subjective complaints and include "limited flexion and extension of the lumbar spine and weakness of extensor hallucis on the left side" and that "[e]xcessive driving would further aggravate his symptoms."  *Id.*

On May 10, 1996, Dr. Goll's physical examination revealed markedly restricted flexion and extension of Mr. Howell's lumbar spine.  *Id.*  Dr. Goll continued Mr. Howell's no-work status.  *Id.* at 310.  In response to an inquiry from a claims adjuster from Mr. Howell's employer, Dr. Goll opined that Mr. Howell's specific limitations included:

1. No driving for more than 15 to 20 minutes.
2. No prolonged sitting for more than 30 to 45 minutes at a time.
3. No prolonged standing more than 30 to 45 minutes at a time.
4. No lifting greater than 10 pounds.
5. No repetitive bending.
6. No climbing.
7. The patient is capable of doing sedentary desk work only with the above provisions.

*Id.*  Epidural steroids were recommended and Mr. Howell was to remain off work at the present time.  *Id.*  On May 24, 1996, Dr. Goll is advised that Mr. Howell received a series of three epidural steroid injections that were well tolerated.  *Id.* at 309.

On June 18, 1996, Dr. Goll's physical examination revealed a marked restriction of range of motion of Mr. Howell's lumbar spine.  *Id.* at 309.  He remained "off work at

this time." *Id.* Dr. Goll recommended a lumbar myelogram with post status CT scan because of Mr. Howell's "persistent symptomology." *Id.*

On July 8, 1996, Mr. Howell was admitted to Florida Hospital Orlando with a diagnosis of left recurrent left lumbar radiculitis and status post lumbar fusion. Mr. Howell was admitted to undergo a lumbar myelogram with post-myelogram CT. No complications were noted. *Id.* at 309.

On July 19, 1996, Mr. Howell returned to Dr. Goll for a follow-up appointment. *Id.* at 308. Dr. Goll reviewed the results of the lumbar myelogram and CT and noted, in part, that "[t]here is no significant neural impingement" and "[i]n short, no evidence of any recurrent nerve compression is seen." Dr. Goll also noted "[t]his is a very difficult situation. He has quite significant pain, although I do not see any way in which we can help him by further surgery." *Id.* Dr. Goll recommended that Mr. Howell be evaluated by a pain management specialist and continued him on a no-work status. *Id.* at 307. Dr. Goll further recommended that Mr. Howell

> get a functional capacity evaluation so that we can learn together what his physical capabilities are at the present time. His work situation is a difficult one. He comes from a position where he was a store manager working 60–70 hours per week. Furthermore, it is difficult for him to work light duty in his previous location because this requires over an hour of driving, and he is clearly unable to drive at this time. I am going to keep him off work at the present time, but I did advise him that once we get the functional capacity evaluation, this may serve as the basis for permanent work restrictions. Hopefully with treatment through Doctor Melvin, he will be able to get better and return to his previous position as the store manager, as this is his main goal. He currently has 18 years with the company and is looking forward to completing a full 20 years.

*Id.* at 307.

Mr. Howell did not keep his September 6, 1996, appointment with Dr. Goll. *Id.* at 307. On September 21, 1996, Dr. Goll noted, however, that Mr. Howell had a functional

capacity evaluation dated August 15, 1996, and impressions are noted. *Id.* at 306-07. Dr. Goll also noted the Mr. Howell had an independent medical examination with Eugene A. Melvin, Jr., M.D., on September 3, 1996. *Id.* at 306.

On September 27, 1996, Mr. Howell had another office visit with Dr. Goll who mentions Dr. Melvin's report[3] and Dr. Melvin's functional capacity evaluation. The latter evaluation "indicated capacity to work in sedentary to light category." *Id.* at 306. Dr. Goll reports the results of a physical examination: Mr. Howell stood erect; was very tender to palpitation of right and left paraspinal regions; significant restriction of his range of motion of the lumbar spine; 4/5 strength in lower extremities, all motor groups, secondary to pain. *Id.* New X-rays were obtained. Dr. Goll's impression was: status post fusion L4-5 with apparently solid fusion but residual instability L4-5. *Id.* Dr. Goll noted that the X-rays show a solid fusion, but he thought there was "some abnormal motion at the L4-5 level" and recommended a three-level lumbar discogram. *Id.* at 305.

Dr. Goll continued Mr. Howell "off work at this time pending scheduling of the lumbar discogram." *Id.* at 305. Per Dr. Melvin's recommendation, Dr. Goll prescribed Klonopin and noted that Mr. Howell should continue taking Darvocet-N 100, #80. *Id.*

On November 18, 1996, the discogram was performed at Florida Hospital Altamonte on an out-patient basis. *Id.* at 304-05. Dr. Goll opined the discogram indicated "the concordant pain response at L4-5 level with anatomic evidence of structurally compromised disc. Post discogram CT scan to follow." *Id.* at 304.

On November 26, 1996, Dr. Goll reviewed the CT scan in conjunction with other studies and opined that they have isolated the source of the pain to the L4-5 level. *Id.*

---

[3] The noted impression is: "1. Post-laminectomy syndrome with evidence of bilateral lumbosacral plexopathy. 2. Left gluteus tendinitis. 3. Sleep disorder. 4. Depression." *Id.* at 306.

at 303.  Dr. Goll and Mr. Howell discussed surgical intervention and Mr. Howell

indicated he wished to proceed with surgery.  *Id.*  Mr. Howell remained off work until

surgery was scheduled.  Dr. Goll estimated that Mr. Howell would be off work for

approximately an eight week period, "at which time he might be able to return to work in

a light duty capacity as long as he did not have to drive excessive distances to reach his

place of employment."  *Id.* at 302.

Mr. Howell's surgery was scheduled for January 1997, but he cancelled it due to

impotence problems he had been experiencing since his first surgery (discogram) in

November 1996.  *Id.* at 302.  On January 20, 1997, Mr. Howell reported to Dr. Goll that

this issue had caused him significant stress and he did not feel as though he could go

through with surgery until this problem had been resolved.  *Id.*  Dr. Goll noted that

Mr. Howell

> has not experienced any increase in back pain and no change in leg
> symptomology since the discogram.  Physical examination shows the patient
> stands erect.  There is no tenderness on palpation over the spine or paraspinal
> areas or flank areas.  Range of motion of the lumbar spine is restricted as it has
> been in the past.  Neurologic exam of the lower extremities shows negative
> sitting root test.  He demonstrates 5/5 strength in all motor groups of the lower
> extremity today which actually represents slightly improvement from some
> previous examination.  Sensory exam is intact to light touch.

*Id.* at 302.  Dr. Goll's impression was: status post fusion, L4-5 with evidence of dynamic

instability L4-5; discogenic pain, L4-5; and impotence.  *Id.* at 301.  A urologic

examination and a lumbar myelogram were recommended.  Mr. Howell's work status

remained the same.  *Id.*  Dr. Goll did not believe Mr. Howell's impotence was specifically

related to his work injury.  *Id.*

Mr. Howell did not keep a February 4, 1997, appointment with Dr. Doll, but

followed-up with a February 28, 1997, appointment.  *Id.* at 300.  Mr. Howell had seen an

urologist (Robert Weaver, M.D.) and no physiologic reasons for the impotence had been discovered thus far.  *Id.*  Mr. Howell returned to Dr. Goll with complaints of depression and requested a psychiatric evaluation and also advised that his back pain and leg symptoms persist.  *Id.*  A physical exam showed tenderness on palpation over the lumbar spine and Mr. Howell had pain with flexion and extension of the lumbar spine.  A neurologic exam of the lower extremities was normal.  *Id.*  Dr. Goll agreed that Mr. Howell was depressed and this was impacting upon his recovery.  *Id.* at 299.  He recommended a psychological evaluation with Mark Clay Williams, Ph.D., for evaluation and treatment of the depression.  *Id.*  Mr. Howell's work status remained the same and Dr. Goll noted: "I would recommend holding off on any recommendations for spinal reconstructive surgery at this time.  Operating in the face of unresolved depression would decrease his chances of a successful response to surgical intervention."  *Id.*

A March 5, 1997, addendum noted that Mr. Howell was scheduled for a myelogram, but it was cancelled "per the instructions of [his] attorney, who had arranged for a second opinion/ consultation."  *Id.* at 299.

By letter dated March 21, 1997, Mary Clay Williams, Ph.D., advised of a clinical interview with Mr. Howell and a diagnoses that included major depression and a recommendation that Mr. Howell have individual psychotherapy.  *Id.* at 298 (Dr. Goll's patient note.).

On March 20, 1997, Mr. Howell saw Dr. Williams for a psychological consultation.  *Id.* at 17-18, 284-86.  Mr. Howell reported that he was having problems with anxiety, nervousness and experienced both bad and good days.  *Id.* at 285-86.  Dr. Williams' diagnoses included chronic pain disorder associated with both psychological factors and

a general medical condition; major depression, single episode, moderate; generalized anxiety disorder; male erectile disorder, secondary to anxiety and depression; and chronic low back and bilateral leg pain, by history. *Id.* at 286. Mr. Howell returned to Dr. Williams for six counseling sessions (from June 5, 1997, through September 12, 1997) where it was repeatedly noted that Mr. Howell displayed pain behavior. *Id.* at 275, 277-79, 281-82.

On April 18, 1997, Mr. Howell returned to see Dr. Goll. *Id.* at 298-99. Mr. Howell had been seen by Dr. Greg Munson for a surgical spine evaluation who recommended deferring surgery. Dr. Munson concurred with Dr. Goll's "observations of solid fusion at L4-5." *Id.* The physical exam showed tenderness on the location of the lumbar spine and that Mr. Howell had been with flexion and extension of the lumbar spine, but no focal neurologic deficit noted on the lower extremity exam. *Id.* Dr. Goll opined that surgery should be deferred until Mr. Howell resolved his major depression and he also believed that the depression was related to his work injury and further recommended he be approved for individual psychotherapy as recommended by Dr. Williams. *Id.* Mr. Howell remained "off work." *Id.* at 297.

On July 14, 1997, Mr. Howell returned for an office visit with the status quo maintained and he remained "off work." *Id.* at 296.

On September 12, 1997, Mr. Howell returned to Dr. Goll's office for a follow-up visit. *Id.* at 296. A physical exam showed "markedly restricted range of motion of lumbar spine, flexion 20 degrees, extension 10 degrees, lateral bend 10 degrees to the right and left. Neurologic exam of the lower extremities shows sitting root test reproduces buttock and posterior thigh pain, no focal motor or sensory deficit." *Id.*

Dr. Goll's impression was status post lumbar fusion L4-5 with segmental instability, depression, and impotence, likely related to depression. Mr. Howell was continued "off work." *Id.* at 295.

On December 10, 1997, Mr. Howell saw E. Michael Gutman, M.D., a psychiatrist, for a psychiatric evaluation to determine Mr. Howell's "mental condition, diagnosis, prognosis, recommendations for treatment and disability status as related to injuries sustained in a work-related accident on August 19, 1991. Also to be determined is whether the evaluee has reached MMI, and if she [sic] has sustained any permanent impairment from a psychiatric standpoint." *Id.* at 54, 370, 495. (Dr. Gutman only treated Mr. Howell for psychiatric conditions. *Id.* at 419.)

On December 16, 1997, Dr. Gutman wrote a report detailing his results of the evaluation. *Id.* at 370-381, 495-506. His diagnostic impressions included atypical depressive disorder with anxiety; status/post work-related low back injury with lumbar fusion surgery, 10/28/93, and recurrence of pain 12/95; moderate depression severity regarding psychological stressors, low back pain, not working and impotence; and an Axis V Global Assessment of Functioning (GAF) current score of 64. Dr. Gutman also stated that Mr. Howell's GAF highest past year score was "undetermined." *Id.* at 379, 504.[4] Dr. Gutman concluded that Mr. Howell had "not reached MMI from a

---

[4] The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000) states that the GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 30-32. A GAF score of 61 to 70 reflects "**[s]ome mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household**), but generally functioning pretty well, has some meaningful interpersonal relationships**." *Id.* at 34.

psychological standpoint, but [he expected] he will show a positive response to prompt, vigorous treatment."  Dr. Gutman was "unable to determine whether [Mr. Howell] will have any permanency, until [he had] an opportunity to observe his response to treatment, and until the cause of the impotency is learned and addressed with treatment.  The evaluee is able to work with restrictions."  *Id.* at 380-81, 505-06. Dr. Gutman also noted that Mr. Howells' atypical depressive disorder with anxiety is causally related to his August 19, 1991, work-related injury and that was in need of psychiatric treatment and he prescribed an anti- depressant.  *Id.* at 381, 506. Dr. Gutman also noted that Mr. Howell was "able to work within his orthopedic limitations, with no exposure to excessive, non-customary deadlines, quotas or work stresses."  He also urged the completion of "the urological work-up" be completed, Mr. Howell told of the results, and "treatment, either medical or psychiatric, can be initiated."  *Id.* at 381, 506.

Mr. Howell continued seeing Dr. Gutman for counseling and medication management through August 2007.  *Id.* at 343-47, 351-69, 387-99, 469-94. Mr. Howell's first return visit was on December 23, 1997.  He had been placed on Effexor and was on LifeGuard and StarPac.  During the office visit on January 20, 1998, Mr. Howell was placed on Risperdal.  *Id.* at 369, 469.

On December 10, 1997, Mr. Howell returned to Dr. Goll who reported that Mr. Howell had a urologic evaluation with Nabil Hilwa, M.D., although only raw sheet data was received.  *Id.* at 295[5]  Mr. Howell complained of back and bilateral leg pain as previously noted.  Mr. Howell saw Dr. Michael Broom for a spinal evaluation.  Dr. Broom

---

[5]  It appears Mr. Howell had visits with Dr. Hilwa first on October 22, 1997, *id.* at 332, through February 14, 2003.  *Id.* at 325-33.

recommended epidural steroids and Dr. Goll concurred. Dr. Goll recommended to the Workers' Compensation carrier that Mr. Howell be scheduled for a follow-up visit with Dr. Hilwa so conclusions can be drawn regarding his impotence evaluation. *Id.* at 294. A December 12, 1997, addendum indicates that Mr. Howell "remains off work." *Id.*

On or about January 7, 1998, Mr. Howell received "three epidural steroid injections which were tolerated well." *Id.*

On January 21, 1998, Mr. Howell returned to see Dr. Goll. *Id.* at 293. Dr. Goll noted: "At this point in time both Mr. Howell and I realize that he is really not a candidate for further orthopaedic intervention. I recommend we repeat a functional capacity evaluation at this time to determine exactly what his physical capabilities are and this can then form the basis for permanent work restrictions from an orthopaedic standpoint." *Id.* Mr. Howell was continued "off work at this time." *Id.* It was also recommended that Mr. Howell continue under the psychiatric care of Dr. Gutman. *Id.* Mr. Howell was prescribed Vicodin, Sinequan, and Duract. *Id.*

On March 4, 1998, Mr. Howell returned to Dr. Goll after having a second functional evaluation performed. *Id.* Based on the results of the functional capacity evaluation, Dr. Goll recommended that Mr. Howell have

> permanent work restrictions in the sedentary work capacity. He should do no lifting of greater than 5-10 pounds. He may do occasional bending and squatting, occasional standing, walking, and alternating from a sitting and standing position. There is no contraindication to operation of hand or foot controls. He may do occasional stair climbing. He should not do any ladder climbing.

*Id.* at 292-93. Dr. Goll opined Mr. Howell had reached MMI and placed him at a 17.5% partial permanent impairment rating per the Minnesota Disability Schedules. *Id.* at 292.

(Dr. Goll's release with restrictions of permanent sedentary work was noted by Dr. Gutman on March 13, 1998. *Id.* at 368, 470.)

In a March 27, 1998, addendum, Dr. Goll noted that based on Mr. Howell's recent functional capacity evaluation, "permanent light duty restrictions have been assigned." Dr. Goll recommended Mr. Howell be referred to pain management as he did not feel Mr. Howell was a candidate for further orthopedic intervention. *Id.* at 292.

On May 6, 1998, Dr. Goll had a telephone conversation with Mr. Howell who expressed dissatisfaction with his pain management physician, Richard L. Smith, M.D. *Id.* at 292. Mr. Howell reported he saw Dr. Smith on one occasion and had a follow-up appointment scheduled for epidural blocks, but he was unable to get prescriptions for pain from Dr. Smith so Dr. Goll prescribed a one-time prescription for Vicodin. *Id.*

On May 12, 1998, Dr. Gutman felt that Mr. Howell had "basically reached MMI as related to the industrial accident, but [he] would like to see if [he] could eke out a little more improvement." *Id.* at 366, 471.

On May 13, 1998, Mr. Howell saw Dr. Smith for facet joint injections at the L2-3, L3-4 level on the left side and sacroiliac joint injection on the left side. *Id.* at 288-89. Dr. Smith noted Mr. Howell had "severe postlaminectomy syndrome at the lumbar level." *Id.* at 288.[6]

In a May 19, 1998, addendum, Dr. Goll stated that he had received a job description provided by Sandra Sweeney and stated:

> The job is entitled 'Unit Pricing Assistant'. This is a local Kmart store here in Orlando. I have reviewed the physical requirements of the job and find them to

---

[6] Mr. Howell was treated by Dr. Smith in 1998, *id.* at 288-89; in 1999, *id.* at 348-50, and from approximately June 30, 2005, through June 7, 2007, and on October 17, 2007, based on Dr. Smith's patient notes. *Id.* at 334-42, 348-50, 420-21.

be well within Mr. Howell's sedentary work restrictions.  I feel that it is medically acceptable for him to perform this job from an orthopaedic standpoint.

*Id.* at 291.

On May 26, 1998, Dr. Gutman noted that he added Lithium during the last visit and also noted Mr. Howell continued taking Anafranil, Risperdal, and Effexor and also that Mr. Howell was using Vicodin, and further noted that he had never observed any suggestion of abuse or overuse of medications.  Dr. Gutman opined that Mr. Howell had "attained a 5% permanent impairment as a result of his Chronic Depressive Disorder with anxiety, causally related to his August 19, 1991, industrial accident."  *Id.* at 367, 472.

On June 5, 1998, Dr. Gutman reported that he was unable to stabilize Mr. Howell on an outpatient basis and recommended that he be treated at Sand Lake Hospital by Dr. Saavedra."  Dr. Gutman's diagnosis was major depressive disorder.  *Id.* at 367, 472.

On June 11, 1998, Dr. Gutman's office was informed that Mr. Howell would be released from the hospital and "not currently suffering with suicidal or homicidal thoughts," but in need of "individual counseling on a weekly basis."  *Id.*  On June 15, 1998, during an office visit, Mr. Howell informed Dr. Gutman of his release from the hospital.  They discussed his participation in group counseling, which he began on June 16, 1998.  *Id.* at 365, 473.

A July 9, 1998, note from Dr. Gutman indicates that Mr. Howell was on a no work status as of June 15, 1998.  *Id.* at 365, 473.  On July 10, 1998, after receiving an inquiry from Ms. Sweeney regarding Mr. Howell's work status, Dr. Gutman felt "he is able to return to work from a psychiatric standpoint" and would release him as of July 16, 1998.  *Id.* at 364, 474.  "He will start by working three hours a day for the first week.  I believe a

slow, gradual integration is needed.  The second week he will work four hours each day.

I have told him to increase his hours by one hour each week.  He will continue on the

same medications, and continue with group counseling.  He is stable on the current

medications." *Id.*

On August 13, 1998, John B. Roberts, M.H.S., of JBR Consultants Rehabilitation

Counseling and Social Security Rehabilitation, completed a vocational/re-employment

assessment on Mr. Howell.  *Id.* at 226-31.  Mr. Roberts summarizes the medical records

that he reviewed.  *Id.* at 228-29.  After a review of all of the relevant medical evidence,

Mr. Roberts concluded that Mr. Howell

> has severe limitations and there has been a decline in his activities in the
> relevant domain of motor functioning, his concentration, persistence, and pace in
> age-appropriate activities.  The claimant's physical and mental capacities has
> [sic] been reduced in his abilities to perform on a <u>sustained basis</u> (i.e., 8 hours a
> day, 5 days a week) the types and ranges of exertional and nonexertional
> activities; e.g., sitting, standing, walking, lifting, carrying, pushing, pulling,
> reaching, concentrating, reasoning and making sound judgments.
>
> Based on all of the evidence reviewed, it is my opinion that Mr. Howell's
> complaints would be consistent with the medical evidence in limiting his ability to
> perform less than sedentary work.  In the review of all evidence, Mr. Howell's
> impairment's [sic] substantially reduces his physical or mental ability to function
> independently, appropriately, and effectively, in performing any and all jobs.  He
> has pain, which would further limit him in performing any job and he is
> unemployable.

*Id.* at  230-31.

On August 14, 1998, Mr. Howell had an office visit with Dr. Goll reporting a new

injury which he sustained 2 1/2 weeks ago when his left leg gave out.  *Id.* at 291.  A

physical exam of the lumbar spine showed tenderness over L1-2 and left paraspinal

spasm.  Range of motion of the lumbar spine is limited.  A neurologic examination of the

lower extremities was non-focal.  *Id.*  Mr. Howell was continued with the same

permanent light duty restrictions as previously assigned. *Id.* at 290; *see id.* at 363, 475 (Mr. Howell reporting on July 28, 1998, to Dr. Gutman's staff that his leg gave out and also reported having pain and participating in group sessions).

On August 14, 1998, Mr. Howell also had a visit with Dr. Gutman. He reported trying to work a few hours a day, but unable to work reliably. "He is doing pricing." Dr. Gutman noted that he continues to have "severe low back pain," that is being treated by Dr. Smith with Neurontin and MS Contin. Dr. Gutman prescribed Effexor, Xanax, and Risperdal. "The combination of anti-depressants and nutritional supplements has given relief." Dr. Gutman continued to opine that Mr. Howell suffers from major depressive disorder and had reached MMI. *Id.* at 362, 476.

In September and October 1998, Mr. Howell reported to Dr. Gutman's staff that he was in pain and taking MS Contin prescribed by Dr. Smith, but he was unable to drive. On September 15, 1998, Mr. Howell reported only working three days over the last two weeks due to increased pain level. *Id.* at 361, 477.

During the hearing held before the ALJ, Mr. Howell stated that in 1998 he worked at a Kmart store near his home for approximately "10 hours a week or something like that and they finally told [him] not to come back." *Id.* at 39. Mr. Howell testified that he was accepted as being permanently and totally disabled and he started receiving biweekly workers' compensation benefits. *Id.* The record further reflects that Kmart's carrier, IHDS of Tallahassee/IHDS Corporation, administratively accepted the claim as of October 1, 1998, "[d]ue to the combination of the claimant's work restrictions and lack of successful re-employment efforts, E/C is administratively accepting claimant PTD (permanently and totally disabled)." *Id.* at 272-73, 467-68; *see id.* at 361, 477 (Dr.

Gutman noting that Mr. Howell indicated that "he has been declared permanently and totally disabled"); 359 (Mr. Howell sharing his experience with the workers' compensation system during a group session).

The record contains additional patient notes from Dr. Gutman and from his staff from approximately November 10, 1998, through approximately May 3, 2005. *Id.* at 351-60, 478-94. Throughout this time period, Mr. Howell attends group counseling sessions. At various times, Dr. Gutman reports that his diagnosis of major depressive disorder is in "fair control." *Id.* at 351, 486 (July 12, 2000, and October 17, 2000); *see also* 487-94 (notations of chronic depressive disorder on October 30, 2001, January 29, 2002, April 23, 2002, July 23, 2002, October 22, 2002, January 15, 2004, July 14, 2004, October 12, 2004, January 18, 2005, and May 3, 2005).

On December 20, 2004, Sedgwick Claims Management Services requested a Reemployment Assessment for Mr. Howell's workers' compensation claim. *Id.* at 238-241. It was completed by case manager, John Kobelsky, CDMS, QRP, CCM from GENEX Services, Inc. *Id.* at 241. Mr. Kobelsky opined:

> based on length of time since claimant employed, claimant's apparent motivation to return to work post injury and surgery, documented physical restrictions to sedentary strength with only occasional bending, squatting, standing, walking, and stair climbing along with required positional changes, formal education of 9th grade with GED, chronic narcotic use, difficulty with ambulation, continued psychiatric and pain management care 13 years post injury, limited transferable skills, lack of transportation, and high impairment rating, it would be difficult for claimant to retain employment on a full or part time basis at this time.

*Id.* at 240-41.

On June 19, 2007, Mr. Howell went into a local Social Security field office to complete a Disability Report. *Id.* at 168-171. The interviewer noted Mr. Howell "walked

very slow with a marked drag of left leg. [Mr. Howell] had to stand during the interview

lasted about 20 minutes sitting before he got uncomfortable" [sic]. *Id.* at 170.

On June 19, 2007, the Social Security Administration requested information

regarding Mr. Howell's workers' compensation disability benefits. *Id.* at 136. Sedgwick

Claims provided information showing Mr. Howell was receiving permanent total

disability benefits for dates June14, 2007–June 27, 2007. *Id.* at 137-38.

On September 8, 2007, Pamela D. Green, Ph.D, a non-examining state agency

consultant, completed a Mental Residual Functional Capacity Assessment, id. at 400,

and a Psychiatric Review Technique (PRT). *Id.* at 404. In the former, Dr. Green

concluded that Mr. Howell was not significantly limited in all areas except for concluding

that he was moderately limited regarding the ability to work in coordination with or

proximity to others without being distracted by them, the ability to accept instructions

and respond appropriately to criticism from supervisors, and the ability to get along with

coworkers or peers without distracting them or exhibiting behavioral extremes. *Id.* at

400-01. Dr. Green noted Mr. Howell can understand short simple routine data; has

somatic concerns; has a history of reduced social skills, irritability and less patience with

others; is stable with current meds; and travels the community as physically able. *Id.* at

401. In the PRT, Dr. Green believed Mr. Howell suffered from chronic depressive

disorder, with mild restrictions of activities of daily living and difficulties in maintaining

concentration, persistence, or pace; moderate difficulties in maintaining social

functioning; and no episodes of decompensation, each of extended duration. *Id.* at 414.

In her consultant's notes, Dr. Green states in part: "Based upon the MER the client has

some symptoms which are consistent with the clinical data. [T]he client has been

treated for chronic depression for many years. [N]o current decompensations. [T]he client appears to be stable. [N]o severe deficits identified. See MRFC." *Id.* at 416.

On October 17, 2007, Dr. Smith completed a questionnaire at the request of the Division of Disability Determinations. *Id.* at 421. Dr. Smith described Mr. Howell's gait and station as antalgic. *Id.* He opined Mr. Howell could not squat, walk on toes or walk on heels. *Id.* Dr. Smith further opined Mr. Howell needed to use a cane for long walks. *Id.*

On May 16, 2008 and May 23, 2008, Leif Davis, Psy.D., a second non-examining state agency consultant, reviewed the record and completed a Mental Residual Functional Capacity Assessment and a PRT. *Id.* at 422, 426. Dr. Davis believed Mr. Howell suffered from depression, a history of generalized anxiety disorder and a pain disorder associated with a general medical condition and psychological factors. *Id.* at 429, 431-32; *see id.* at 424, 438 (consultant's notes). Dr. Davis believed Mr. Howell was moderately limited in his activities of daily living, the ability to maintain concentration, persistence or pace, the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* at 422-24, 436. He was not significantly limited in all other areas. *Id.* Dr. Davis further believed Mr. Howell was mildly limited in his ability to maintain social functioning and had no episodes of decompensation, each of extended duration. *Id.* at 436.

On September 16, 2008, Mr. Howell saw Abdul H. Sofi, M.D., at Premier Medical Clinic (Premier), for the first time. *Id*. at 449-50. (Tae Yu, D.O., and Dr. Sofi are in the same group practice. *Id*.) Mr. Howell presented with symptoms (lasting 3-4 months) of abdominal pain, alternating diarrhea and constipation. *Id*. at 449. From a neurological perspective, Mr. Howell had no headaches, no focal numbness or weakness, no seizures, no vision loss, and no gait problems. Id. Prior back surgery is noted. *Id*. A physical examination that included a muscular-skeletal exam was normal. *Id*. at 450. A follow-up in a couple of weeks was noted. *Id*.

On September 30, 2008, Mr. Howell had a follow-up exam with Dr. Sofi and reported the "abdominal pain has improved a little bit." *Id*. at 448. An upper and lower GI endoscopy revealed Mr. Howell had some gastritis, severe reflux, and also some diverticulosis and polyps. Nexium and Atenolol (for blood pressure) were prescribed. *Id*.

On May 6, 2009, Mr. Howell presented to Premier and met with Dr. Yu "essentially to establish care." *Id*. at 447. Chronic low back pain is noted. Mr. Howell advised that "that his pain has gotten progressively worse going down his left leg. His history is that he has had workman's com related injury back in 1993. Lumbar fusion of L4, L5 and he became totally disabled back in 1998. He settled with his employer back in 2000. He has inability to go back to work. . . . Main complaint is related to his back pain radiating down to the left leg." *Id*.[7] Dr. Yu's assessment included chronic low back pain. Naprosyn, Baclofen, and Vicodin were prescribed with

---

[7] Cambridge Integrated Services Group Inc. (a carrier) prepared a document dated January 5, 2000, that reflected an increased patient supplemental rate for Mr. Howell, effective January 1, 2000, and also an accepted/adjudicated date of October 1, 1998. *Id*. at 270, 465.

a follow-up in one month when an MRI of the lower back and lumbar spine would be considered.  *Id.*  A follow-up visit was conducted on June 3, 2009, with Mr. Howell "[i]n no acute distress" and continued on the same medication.  A neurological exam was appropriate.  *Id.* at 446; *see id.* at 445 (similar results of a September 3, 2009, visit).

On September 23, 2009, Mr. Howell saw Dr. Yu for a follow-up appointment for his low back pain.  *Id.* at 444.  Physical examination of Mr. Howell's muscular-skeletal system revealed: "He has obvious limitations due to his low back.  He has about a 30 degree angle of the lumbar spine.  He is unable to get up from his seat without assistance from his hands."  *Id.*  Dr. Yu's assessment and plan noted:

> 1.  Chronic low back pain from injury with this lumbar effusion.
> At his state and his limitations he is not going to be able he is not
> going to be able to return back to work.  He states he is unable to sit
> or stand for long periods of time that is about 30 minutes.  He is unable
> to lift more than 15 or 20 lbs but not on a repetitive lifting of an
> 8 hour work day.  With these obvious limitations I don't foresee
> him going back to work.  I filled the paperwork out to initiate his disability for the
> state.

*Id.*  On the same date, Dr. Yu completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) for Mr. Howell.  *Id.* at 266-69, 440-43.  Dr. Yu opined Mr. Howell could occasionally lift 20 pounds and frequently lift less than 10 pounds.  *Id.* at 266, 440.  He further opined Mr. Howell could stand and/or walk less than 2 hours in an 8-hour workday and could sit less than about 6 hours in an 8-hour workday.  *Id.* at 266-67, 440-41.  Dr. Yu opined Mr. Howell was limited in his ability to push and/or pull with his upper and lower extremities.  *Id.* at 267, 441.  Dr. Yu noted: "Due to his back pain and injury, [Mr. Howell] is unable to sit or stand in place for longer than 30 minutes.  Any major lifting or pulling exacerbates his back pain.  All his symptoms are related due to work related injury that has caused permanent impairment."  *Id.*  Dr. Yu opined

Mr. Howell could never climb ramps, stairs, ladders, ropes, or scaffolds, kneel, crouch, crawl or stoop and could only occasionally balance. *Id.* Dr. Yu noted "[Mr. Howell] is unable to bend or squat without falling. He has to use his hands." *Id.* He opined Mr. Howell was limited in his ability to reach in all directions, including overhead, and it would be difficult for him to handle objects if he had to balance upright. Mr. Howell's ability regarding handling, fingering, and feeling as well as seeing, hearing, and speaking were rated as unlimited. *Id.* at 268, 442. Dr. Yu finally opined Mr. Howell's ability to be exposed to vibration was limited as it would exacerbate his back pain; his ability to be exposed to humidity/wetness was limited as it would cause his joints to hurt; and his ability to be exposed to hazards was limited as he could not climb to work around machinery. Temperature extremes, noise, dust, fumes, odors, chemicals, and gases were rated unlimited. *Id.* at 269, 443.

Mr. Howell had follow-up visits with Dr. Yu on December 8, 2009, and February 24, 2010. *Id.* at 457-59.

## V. Hearing Evidence

### A. Mr. Howell (Plaintiff)

Mr. Howell is not married and has no children under the age of 22. *Id.* at 30-31. He has a Florida driver's license without any limitations or restrictions. *Id.* at 31. He completed the ninth grade, but has not had any vocational training. *Id.*

From 1977 through April 1996, Mr. Howell worked as an assistant manager and in a supervisory capacity at Kmart. He started as a "stock person" and worked his way up to store manager where he remained for three years. *Id.* at 31-32, 174. As a store manager, he was out on the sales floor supervising the operations of the store and then

he would be in the office doing paperwork, a combination of standing or sitting most of the day--probably about half and half. *Id.* at 32-33.

Mr. Howell was initially injured in August 1991. *Id.* at 37. Dr. Goll and Dr. Huff performed surgery in October 1993. *Id.* at 37-38. Mr. Howell returned to work at Kmart as the merchandise or store manager and worked from February 1994 until April 1996. *Id.* at 38. He did a little better after the surgery and then started getting worse. He was working 20 hours at the time and then reduced to 10 hours a week and then he "just couldn't work." *Id.* at 39. Dr. Goll took him off work after he returned to work in April 1996. *Id.* at 50.

He has not worked since April 7, 1996. He has received workers' compensation benefits, effective October 1, 1998, and on a bi-weekly basis. *Id.* at 33, 39, 270-73, 465-68; *see also supra* at 22-23. He has not received unemployment benefits since the alleged onset date. *Id.* at 33.

Mr. Howell explained the nature of his impairments existing during the relevant period (April 7, 1996 - June 30, 2004, *id.* at 30) that caused him to be disabled or unable to work. *Id.* at 33. He had back surgery and, as a result, he could not stand for more than 10 to 15 minutes at a time and could not sit very long. He had to lay down most of day due to the pain. *Id.* at 33-34. He was also depressed and had anxiety. He was hospitalized once at Sand Lake Hospital in and around June 5-11, 1998, under the care of Dr. Saavedra. Dr. Gutman's patient notes are the only records relating to the hospital stay. *Id.* at 34, 36, 367, 472.

His problem (prior to 2004) is with his "[l]ower back and legs." *Id.* at 39. He has "a lot of pain running down [his] legs, burning sensation, sharp pains. I mean they

would just go numb and go out from under [him]"-"[t]wo or three times a week on average." *Id.* at 40. He would fall sometimes so he had a cane. He told Dr. Goll and Dr. Smith that he had fallen. Dr. Smith was treating him for the pain running down his legs and a burning sensation. *Id.* at 50.

Prior to 2004 and perhaps in 1997 or 1998, Dr. Goll explained to him that he wanted to do another surgery and "go into the front and do another fusion, cut me open in the front and go in that way and I refused it" because Dr. Goll told him it might make him worse--"just a 50/50 chance it would held [him]." *Id.* at 40, 48.

Mr. Howell also sought psychological treatment (for depression and anxiety) from Dr. Gutman for about 9 to 10 years. *Id.* at 41. He was prescribed "a lot of medication for psychological and depression and anxiety" and "[g]roup therapy for a number of years." *Id.* He "was very depressed, anxious all the time, paranoid, had a lot of nightmares" and was not sleeping at night and restless. *Id.* He believed his sleeping problems are attributed to a combination of pain and medications. He told Dr. Smith and Dr. Gutman about these problems before the date last insured, June 30, 2004. *Id.* at 47-48.

He was taking several medications at the time-Effexor, Risperdal, Xanax, and MS. Contin and other pain medications. *Id.* at 42, 242. Mr. Howell experienced side effects from taking medication such as developing acid reflux; constipation from morphine. He felt as though he was in a fog. *Id.* at 42-43. Mr. Howell told Dr. Richard Smith of these side effects. *Id.* at 47, 52. He also told Dr. Hilwa about some of the side effects. *Id.* at 50-52.

In early 2007, he stopped taking the psychological medication because of his stomach problems.  He was not functioning well.  Most of his sleep was during the day. *Id.* at 43.  Mr. Howell stated that Dr. Gutman did not tell him to stop taking the psychiatric medication.  Since stopping this medication, Mr. Howell has not been hospitalized.  *Id.* at 47.

From 1998 until 2004, Mr. Howell says that he was able to stand maybe 10 minutes and could walk maybe one hundred feet without having to sit down.  *Id.* at 44. He was not able to go up and down stairs; could not bend over and touch his toes or squat.  He could sit for 20 to 30 minutes at a time without having to lie down or stand up.  *Id.*  He could lift maybe eight to ten pounds.  During an eight-hour day, he could alternate between sitting and standing probably between two and two and one half hours.  *Id.*  He would have to lie down the rest of the time.  *Id.*

Mr. Howell stated that his back is in the same condition at the time of the hearing as it was since the late 1990's and early 2000's.  *Id.* at 44-45.  He is currently taking Vicodin, Baclofen, and Naproxen.  *Id.*

Mr. Howell's most comfortable position is lying down with some pillows under his knees.  *Id.* at 45.  He lies down "[q]uite a bit."  "Four hours a day" on an intermittent basis and probably about an hour to an hour and a half at a time.  *Id.* at 45-46.

During the relevant period, Mr. Howell lived with his son in the house.  *Id.* at 36. Mr. Howell did not do household chores, such as cooking and cleaning, but was able to take care of his personal hygiene.  *Id.* at 37.  During the relevant period, on a typical day, he would "just sit around."  He could not do much and did not "have any activities." He would watch television and sit on the front porch.  His "brother and his wife live right

behind [him]." *Id.* at 37, 45. His brother's wife cooked all of Mr. Howell's meals, either

bringing the food to his house or their house. She cleaned his home once or twice a

week and do laundry. Their sons and his son helped with the yard work. *Id.* at 45.

Prior to his physical problems, Mr. Howell went water skiing and rode horses.

Now, he cannot ride a horse, go boating, and participate in a lot of outdoor activities. *Id.*

at 46.

Mr. Howell continues to have problems related to depression and anxiety. *Id.* at

51. When a "bad day" occurred between 1998 and 2004, he was not able to "even get

up. The pain and depression was just so bad I didn't want to do nothing – didn't want to

get up." *Id.* at 51-52.

### B. Dr. Feldman (vocational expert)

Dr. Feldman testified as an impartial vocational expert. *Id.* at 54-55. Plaintiff had

no objection to Dr. Feldman testifying in this capacity. *Id.* at 55.

Dr. Feldman described Mr. Howell's past relevant work as a retail sales manager;

Dictionary of Occupational Titles (DOT) number 163.167-018 that is classified as

sedentary work that is skilled in nature with a SVP of 8. *Id.* at 56. Mr. Howell described

the work as walking for four hours a day and sitting for four hours a day so the work

would be classified as light rather than sedentary and, therefore, different under the

DOT. *Id.* The ALJ had the following extended colloquy with Dr. Feldman.

> Q  All right. I'm going to assume that I have an individual who's between the
> ages of 37 and 45 who has the same education and past relevant work as
> described for the claimant [.] I'm further going to assume based on Exhibit 3F,
> page 3, that the individual could perform sedentary work, could occasionally
> bend and squat; he would need to alternate from sitting and standing position; he
> could occasionally climb stairs, but no ladders.[8]

---

[8]  Exhibit 3F consists of patient notes from Dr. Goll. *Id.* at 290-324. The
hypothetical question is derived from Dr. Goll's March 4, 1998, recommendation based

Could the individual perform any past relevant or other work?

A  Well, again he described his particular job as light in nature.  However, as usually performed most jobs like that would be sedentary and that would not be precluded under the hypothetical as given.

Q  All right.  So he could perform his past relevant work as a store manager as described in the DOT, but not as he described it, is that correct?[9]

A  That is correct, Your Honor.

Q  And if I were to add to that that the individual were limited to performing simple, routine, repetitive tasks based on Exhibit 7F, would that change your response?[10]

A  Yes, Judge, that would preclude his work as the store manager.  That is very skilled and not simple at all.

Q  All right.  Would thre [sic] be other jobs taht [sic] could be performed [sic]?

A  Some jobs of [INAUDIBLE] character that would not necessarily be prohibited would be the largest cateogry [sic] of work we have in our economy is retail sales.  This would come under the DOT code number of 209.477-014; classified as light; semiskilled work; with an SVP of 3.

Q  I'm sorry –

A  There are 50,286 –

_____

on the results of a functional capacity evaluation.  *Id.* at 292-93.  A March 27, 1998, addendum patient note states that in light of the recent functional evaluation, "permanent light duty restrictions have been assigned."  *Id.* at 292.  On May 19, 1998, Dr. Goll noted in an addendum that he reviewed a job description for 'Unit Price Assistant' for the local Kmart store provided by Sandra Sweeney and reviewed the physical requirements for the job and found them "to be well within Mr. Howell's sedentary work restrictions.  I feel that it is medically acceptable for him to perform this job from an orthopaedic standpoint."  *Id.* at 291.  An August 18, 1998, note states that Mr. Howell "will continue with the same permanent light duty restrictions as previously assigned."  *Id.* at 290.

⁹  The ALJ found that Mr. Howell was unable to perform his past relevant work as an assistant manager of merchandise, which is sedentary work as described by the DOT, but light work as performed.  *Id.* at 18.

¹⁰  Exhibit 7F is a Mental Residual Functional Capacity Assessment performed by Dr. Green on September 8, 2007.  *Id.* at 400-03; *see supra* at 24-25.

Q  Doctor, let me stop you for a moment.

A  -- jobs –

Q  Doctor, if I could stop you.  The RFC was essentially for sedentary work?

A  Oh, no, I didn't get that, Judge.  Sedentary work, right.

Q  It was the same as the first hypothetical which was for sedentary work; could occasionally bend and squat –

A  Okay.

Q  – needed to alternate between sitting and standing; could occasionally climb stairs, but could not climb ladders; and could perform simple, routine, repetitive tasks.

A  Okay.  Some sedentary work that would not necessarily be precluded would be telephone solicitation; 299.347-014; classified as sedentary; semiskilled work; with an SVP of 3; there are 5,336 jobs noted in the central Florida area; and over three-quarters of a million in the national economy.

Q  Doctor, let me stop you again.  If-- based on the simple, routine, repetitive task limitation, I wanted to limit this individual to unskilled jobs, would there be –

A  Okay.

Q  any sedentary, unskilled jobs that would fit this hypothetical?

A  Yes, Judge.  One of them could be cashier II; 211.462-010; this is listed in the DOT as light; unskilled work; with an SVP of 2.  However, this is a large category of work and the DOT does not try to describe a job, but only a series of jobs and in my opinion, half of these would be sedentary in nature.  There are 21,408 jobs noted in the central Florida area; well over 3 million in the national economy.

    Another type of work that would not be precluded would be bench work assembly type; this would come under the DOT code number is 713.654-014; this is sedentary; unskilled work; there are in the central Florida area, 7,245 nine-precision assembly type jobs so noted; and well over one million in the national economy.

Q  And what is the SVP for that job?

A  That would be unskilled; SVP of 2.

Q  All right.  Do you have another sedentary, unskilled job that would fit this hypothetical?

A  Surely.  Toll or ticket taker; 211.462-038; unskilled job; with an SVP of 2; there [are] 945 jobs noted in the central Florida area; and well over 100,000 in the national economy.

Q  All right.  All right.  The same hypothetical individual, age, education, and past relevant work; based on Exhibit 16 E, the individual could perform sedentary work; he could only occasionally bend, squat -- I'm sorry, withdraw that one.  I note that is essentially 16E the hypothetical would be essentially the same as 3F hypothetical.

   All right.  Same hypothetical individual, age, education, past relevant work; based on Exhibit 14E; the individual could drive for 15 to 20 minutes; could sit for 30 to 45 minutes at a time; stand for 45 minutes at a time; could lift 10 pounds; should do no repetitive bending and no climbing; and he could perform sedentary work with the above limitations.[11]

   Could he perform any past relevant or other work?

A  No, Judge, I might add that all jobs required a certain amount of industrial output.  Now if a person could not be at their workstation to complete those industrial output norms, then they would not be able to engage in competitive work of any kind, but only any sheltered types of employment and the hypothetical as you have just given would not allow for enough time at the workstation to complete those industrial output norms.

Q  And I'm sorry, but which restrictions prevent you from being at the workstation long enough to perform the output?

A  You said there was very limited time of sitting and very limited time standing.
Q  Forty -- I'm sorry, for 45 minutes sitting/45 minutes standing.

A  Right.

Q  Those are the limitations you're referring to?

A  Yes, Judge, that would only allow for only about half an hour -- an hour and a half to be at the workstation.

Q  I'm sorry, but that was at one time.

---

[11]  Exhibit 14E is an August 13, 1998, vocational/re-employment assessment performed by John B. Roberts, M.H.S.  *Id.* at 226-31.  The hypothetical is derived from a May 23, 1996, patient note from Dr. Goll.  *Id.* at 228, 310-11; *see supra* at 10.

A  Oh, oh, if he could continue to do that throughout the day, that would not negate the positions that we have previously discussed because it doesn't matter.  Sedentary work allows for the sitting, but doesn't demand the sitting and so if a person was at their workstation long enough during their workday to complete the industrial output norm, whether they were sitting or standing would be immaterial.

Q  All right.  So could he perform the sedentary jobs you gave me earlier?

A  Yes, Judge, if the person could be at their workstation long enough to complete the industrial output norm, it would be a seven and a half to eight-hour workday that would not prohibit that.

Q  All right.  And add in the limitation of a simple, routine, repetitive task that would -- would he still be able to perform the jobs of bench work assembly, toll or ticket taker, and the numbers that you gave for the -- the reduced numbers for cashier II?

A  Yes, Judge, that would not interfere with that.

Q  All right.  Now if I change the mental limitations from simple, routine to rep -- simple, routine, repetitive tasks to be based on Exhibit 5F, page 48, from Dr. Gutman, he said no exposure to excessive non-customary deadlines, quarters [sic], or work stresses, would that change your response?[12]

A  Well, all jobs have a certain amount of work stress.  As I mentioned before, unskilled work, the work stress would be minimal.  However, I would expect the person to complete the industrial output norm so all competitive work does have a certain small degree of work stress and if a person could not endure that work stress, then they would be only subject to very sheltered types of employment rather than competitive.

Q  Now this limitation says no exposure to excessive non-customary deadlines, quarters [sic], or work stress.  Are you interpreting those to mean more than the normal work stress?

A  Well,  that's what I was giving you, Judge, in that all jobs have a certain amount of work stress, unskilled work has a minimal amount and I'm not sure of the definition in your hypothetical.

Q  All right.

A  So I gave it to you both ways.

---

[12]  Exhibit 5F, page 48, is part of a December 10, 1997, evaluation by Dr. Gutman.  *Id.* at 370-81; *see supra* at 16-17.

Q  All right.

*Id.* at 56-62.

At this point, Mr. Howell's counsel asked Dr. Feldman a "new hypothetical" based on Exhibit 13F, Dr. Yu's September 23, 2009, Medical Source Statement of Mr. Howell's ability to do work-related activities.  *Id.* at 62-65, 26-69, 440-43; *see supra* at 27-28. The following colloquy transpired.

Q  A new hypothetical and this is based on Exhibit 15F [sic].  Assume that the individual can lift occasionally 20 pounds/frequently less than 10 pounds; standing and walking less than two hours and eight-hour workday; and just assuming those factors, would there be any work -- would that alter your opinions?

A  No.  No, the sitting six hours –

Q  No less than.

A  - - and standing two hours would leave enough time for a person to be at their workstation to complete the industrial output norms required.

ALJ:  Dr. Feldman, he indicated sitting less than six hours and could you repeat the rest of it, Mr. Adler?

VE:  Oh, I thought he said -- I'm sorry, I thought you said sitting four of six hours.

BY THE ATTORNEY

Q  No, I said standing less than two hours in an eight-hour workday and sitting less than six hours in an eight-hour workday.

A  Oh, I'm sorry, I misunderstood that.  If a person were not able to be at their workstation long enough to complete the industrial output norms required, again they would be subject to only sheltered employment rather than competitive employment.

Q  So based upon the hypothetical, the only work that would be available, would be in sheltered employment?

A  That is correct and not competitive employment.

*Id.* at 62-63.

Mr. Howell's counsel followed-up with several additional questions based on Mr. Howell's testimony, such as, that he could stand for 10 minutes; walk less than one block; not climb or squat; sit for 30 minutes; lift 10 pounds; and in an eight-hour day, alternating sitting and standing, he would only be able to accomplish that for two to three hours. Dr. Feldman responded that those facts "would eliminate competitive work due to the fact that he couldn't be at a workstation long enough to complete the industrial output norms required." *Id.* at 65. Counsel also asked Dr. Feldman to assume that Mr. Howell had a need to lie down every three hours for 30 to 60 minutes and would have bad days, two days a week where he stayed in bed most of the day. Dr. Feldman opined that these factors would preclude competitive employment. *Id.* at 65-66.

## VI. **Legal Analysis**

Mr. Howell raises three points for consideration: 1) the ALJ erred when she did not consider Mr. Howell's workers' compensation "permanent total disability determination"; 2) the ALJ did not apply the correct legal standards to the opinions of two of Mr. Howell's treating physicians, Drs. Gutman and Yu; and 3) the ALJ's RFC determination for Mr. Howell is erroneous. Doc. 9.

Resolution of the third point requires that this case be reversed and remanded to the Commissioner for further proceedings. In light of this recommendation, it further recommended that the Commissioner re-determine, in light of all of the evidence, whether Mr. Howell was disabled prior to his date last insured.

## A. The ALJ's RFC determination is erroneous.[13]

Mr. Howell argues that the ALJ did not include his moderate limitations in concentration, persistence, or pace in the RFC determination, which is inconsistent with Winschel v. Commissioner of Social Security, 631 F.3d 1176 (11th Cir. 2011). Doc. 9 at 17-24. Mr. Howell's argument is well taken.

The ALJ will be directed to ensure that any hypotheticals the ALJ poses to the vocational expert on remand properly account for Plaintiff's moderate difficulties or limitation in concentration, persistence or pace in accordance with Winschel and that the ALJ expressly consider the opinion of the vocational expert.

At step three of the sequential evaluation process, the ALJ found that Mr. Howell had moderate difficulties with concentration, persistence, or pace. Id. at 13. As noted by the ALJ, these findings are not a RFC assessment, but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The ALJ also stated that the mental RFC used at steps four and five of the process requires a more detailed assessment. Id. at 13-14.

In order to determine Mr. Howell's RFC, the ALJ began her discussion with a review of the limitations claimed by Mr. Howell; some treatment records from Drs. Yu and Smith; opinions of non-treating physicians, including Dr. Williams' opinions and Dr. Gutman's initial psychiatric evaluation; and the opinions of Drs. Green and Davis, two State agency consultants. Id. at 14-18.

The ALJ referred to Dr. Gutman's evaluation and stated in part: "Dr. Gutman opined at the time that the claimant is able to work within his orthopedic limitations,

---

[13]   At step four, the ALJ determined that Mr. Howell was unable to perform any past relevant work. R. 18. Thus, the remaining issue for consideration at step five was whether Mr. Howell's impairments prevented him from performing other work.

with no exposure to excessive, non-customary deadlines, quotas or work stress,

assigning a GAF of 64." *Id.* at 18.  The ALJ assigned moderate weight to

Dr. Gutman's opinion set forth in the paragraph.  *Id.*

It appears the ALJ concluded that Mr. Howell had moderate difficulties in

maintaining concentration, persistence or pace as part of her RFC assessment, which

included her determination that Mr. Howell could "perform simple, routine, repetitive

tasks." *Id.* at 14.

During the hearing, the ALJ asked Dr. Feldman, the vocational expert, several

hypothetical questions.  *Id.* at 56-62.  Dr. Feldman opined that based on the

limitations in the hypothetical questions, Mr. Howell could perform work as a bench

work assembly and a toll/ticket taker, both sedentary, unskilled jobs, with a SVP of 2.

*Id.* at 19, 57-61.  Toward the end of the ALJ's inquiry of Dr. Feldman, the ALJ

changed the limitations from simple, routine, repetitive tasks and added the limitation

from Dr. Gutman's opinion stated above.  *Id.* at 61.  Dr. Feldman opined that all jobs

have a certain amount of stress and even though the work stress of unskilled work

would be minimal, he "would expect the person to complete the industrial output norm

so all competitive work does have a certain small degree of work stress and if a

person could not endure that work stress, then they would be only subject to very

sheltered types of employment rather than competitive." *Id.* at 61-62.  The ALJ then

inquired:

> Q  Now this limitation says no exposure to excessive non-customary deadlines,
> quarters [sic], or work stresses.  Are you interpreting those to mean more than
> the normal work stress?

A  Well,  that's what I was giving you, Judge, in that all jobs have certain amount of work stress, unskilled work has a minimal amount and I'm not sure of the definition in your hypothetical.

Q  All right.

A  So I gave it to you both ways.

Q  All right.

*Id.* at 62.

Winschel instructs that if the ALJ determines a claimant has moderate difficulties in concentration, persistence or pace, then the ALJ's hypotheticals to the vocational expert must account for those difficulties or limitations.  631 F.3d at 1180-81.  In accounting for those limitations, the ALJ should include those limitations in the hypothetical or if the "medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite moderate limitations in concentration, persistence, and pace," the ALJ may account for the limitations by limiting Plaintiff's RFC to simple, routine tasks or unskilled work.  *Id.* at 1180.

The ALJ did not expressly refer to the medical evidence demonstrating that Mr. Howell can engage in simple, routine, repetitive tasks.  Moreover, when Dr. Gutman's opinion was considered by Dr. Feldman, he did not expressly opine that Mr. Howell could perform the jobs as bench work assembly and toll/taker.

On remand, the ALJ should make a specific finding as to whether the record medical evidence supports the conclusion that Mr. Howell can engage in simple, routine, repetitive tasks at any level, despite his moderate limitations in concentration, persistence, or pace, which should include a re-determination of Mr. Howell's RFC.  In the absence of such a finding, the ALJ cannot account for moderate difficulties in

concentration, persistence, or pace by simply limiting Mr. Howell to simple, routine, repetitive tasks.

## VII. Recommendation

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **REVERSED AND REMANDED** pursuant to Sentence Four of 42 U.S.C. § 405(g) to: (i) perform the required analysis at Step Five to determine whether Mr. Howell can perform other work, which includes re-consideration of Mr. Howell's RFC; (ii) make a specific finding as to whether Plaintiff's moderate limitations in concentration, persistence or pace are accounted for in the record medical evidence; and (ii) consider the other matters discussed herein.

**IN CHAMBERS** at Tallahassee, Florida, on February 20, 2013.


<u>s/  Charles A. Stampelos</u>
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**